James S. Brown (SBN 135810)
Eden E. Anderson (SBN 233464)
**DUANE MORRIS LLP**
Spear Tower, One Market Plaza, Suite 2200
San Francisco, CA  94105-1127
Telephone: +1 415 957 3000
Fax: +1 415 957 3001
E-mail:    jamesbrown@duanemorris.com
              eeanderson@duanemorris.com

Attorneys for Defendant
UNIVERSITY OF SAN FRANCISCO WELFARE
BENEFIT PLAN

### IN THE UNITED STATES DISTRICT COURT FOR

### THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.G.,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNIVERSITY OF SAN FRANCISCO WELFARE BENEFIT PLAN,<br><br>                    Defendant. | Case No. 3:23-cv-00299 JSC<br><br>**UNIVERSITY OF SAN FRANCISCO WELFARE BENEFIT PLAN'S NOTICE OF MOTION AND MOTION TO DISMISS OR FOR JUDGMENT, OR PARTIAL JUDGMENT, ON THE PLEADINGS (FRCP 12(B)(1) AND 12(C)); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:        August 24, 2023<br>Time:        10:00 a.m.<br>Courtroom:  8<br>Judge:        Hon. Jacqueline S. Corley<br><br>Complaint Filed:     August 1, 2022 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................6

II.   BACKGROUND ...........................................................................................7

     A.    K.G.'s July 20, 2020-October 20, 2020 Treatment at Unaccredited Bridge House ................................................................................................ 8

     B.    K.G.'s October 20, 2020-July 15, 2022 Treatment at Innercept, Which Became Accredited Effective March 20, 2021 ....................................... 8

     C.    J.G.'s Claims .................................................................................... 8

     D.    Relevant Plan Terms ....................................................................... 9

III.   ARGUMENT ...............................................................................................11

     A.    The Legal Standard ....................................................................... 11

          1.    Rule 12(b)(1) ...................................................................... 11

          2.    Rule 12(c) ........................................................................... 11

     B.    Because J.G. Lacks Standing to Pursue the Claims Alleged, the FAC Should Be Dismissed .............................................................................. 12

          1.    J.G. Does Not Have Statutory Standing Under ERISA .......................... 12

          2.    J.G. Also Lacks Article III Standing.......................................... 14

     C.    To the Extent Recovery Is Sought for Services Rendered at Unaccredited RTCs, the FAC Fails to State a Claim for Relief................................................. 15

          1.    The Parity Act Claim Fails to State a Claim for Relief Because, as a Matter of Law, an RTC Accreditation Requirement Is Not Materially Different Than an SNF Medicare Eligibility Requirement ................................... 15

              a.    The Parity Act...........................................................15

              b.    The FAC Does Not Plausibly Allege a Disparity Between the Plan's Definition of an RTC and the Plan's Definition of an SNF17

          2.    Even if a Parity Act Claim Is Not Alleged, Benefits Cannot Be Paid for Services that the Plan Does Not Cover ................................... 19

     D.    Amendment Would Be Futile ........................................................ 19

     E.    Anthem's Denial of K.G.'s Claim for Post-Accreditation Dates of Service at Innercept Is Reviewed for Abuse of Discretion................................................. 20

IV.   CONCLUSION.............................................................................................20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abatie v. Alta Health & Life Ins. Co.*
    458 F.3d 955 (9th Cir. 2006) ..................................................................................................20

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*
    821 F.3d 352 (2nd Cir. 2016) ..................................................................................................15

*Bell Atlantic v. Twombly*
    550 U.S. 544 (2007) ................................................................................................................17

*Burke v. Pitney Bowes, Inc. Long Term Disability Plan*
    544 F.3d 1016 (9th Cir. 2008) ................................................................................................20

*Burton v. Blue Cross Blue Shield of Kansas City*
    2013 WL 6709570 (D. Kan. 2013) ...................................................................................... 13-14

*Cafasso, U.S. ex rel. v. General Dynamics C4 Sys., Inc.*
    637 F.3d 1047 (9th Cir. 2011) ................................................................................................11

*Curry v. Baca*
    497 F.Supp.2d 1128 (C.D. Cal. 2007) ....................................................................................11

*Delgado v. ILWU-PMA Welfare Plan*
    2019 WL 2864427 (C.D. Cal. 2019).........................................................................................9

*Fleming v. Pickard*
    581 F.3d 922 (9th Cir. 2009) ..................................................................................................11

*Free Spirit Organics, NAC v. San Joaquin Cnty. Bd. of Supervisors*
    471 F.Supp.3d 1039 (E.D. Cal. 2020)......................................................................................11

*H.H. v. Atena Ins. Co.*
    342 F.Supp.3d 1311 (S.D. Fla. 2018) .....................................................................................18

*Hoeft v. Tucson Unified Sch. Dist.*
    967 F.2d 1298 (9th Cir. 1992) ................................................................................................11

*Immanuel Lake v. Zogenix, Inc.*
    2020 WL 3820424 (N.D. Cal. 2020) .........................................................................................9

*J.W. v. Bluecross Blueshield of Texas*
    2002 WL 2905657 (D. Utah 2022) ..................................................................................... 17-18

*Jackson v. Bank of Hawaii*
    902 F.2d 1385 (9th Cir. 1990) ................................................................................................19

*James C. v. Anthem Blue Cross and Blue Shield*
    2021 WL 2532905 (D. Utah 2021) ..................................................................18

*Johnathan Z. v. Oxford Health Plans*
    2020 WL 607896 (D. Utah 2020) ...................................................................17

*L-7 Designs, Inc. v. Old Navy, LLC*
    647 F.3d 419 (2nd Cir. 2011).........................................................................12

*Lightfoot v. Principal Life Ins. Co.*
    2011 WL 2036649 (W.D. Okla. 2011) ..........................................................12

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992)........................................................................................14

*Massey v. Ojaniit*
    759 F.3d 343 (4th Cir. 2014) .........................................................................12

*Munnelly v. Fordham Univ. Faculty*
    316 F.Supp.3d 714 (S.D.N.Y. 2018)..............................................................15

*Potter v. Blue Shield of Calif.*
    2014 WL 6910498 (C.D. Cal. 2014)......................................................... 12-14

*Powers v. Blue Cross Blue Shield of Ill.*
    947 F.Supp.2d 1139 (D. Col. 2013)...............................................................13

*Ray v. PPOM*
    2005 WL 1984470 (E.D. Mich. 2005).............................................................12

*Raygoza v ConAgra Foods, Inc. Welfare Benefit Wrap Plan*
    2016 WL 9454419 (C.D. Cal. 2016)........................................... 9-10, 15, 19

*Rodrigues v. Bank of Am., NA*
    2016 WL 3566950 (N.D. Cal. 2016) ......................................................... 9-10

*Sides v. Cisco Sys. Inc.*
    2017 WL 4236960 (N.D. Cal. 2017) ..............................................................12

*Spinedex v. Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*
    770 F.3d 1282 (9th Cir. 2014) .......................................................................13

*Strigliabotti v. Franklin Resources, Inc.*
    398 F.Supp.2d 1094 (N.D. Cal. 2005) ...........................................................11

**Statutes**

29 U.S.C. § 1132(a)(1)(B) ..................................................................... 8-9, 12, 19

29 U.S.C. § 1185a(a)(3)(A)(ii) ..................................................................16

29 U.S.C. § 1185a ........................................................................ *passim*

**Other Authorities**

29 C.F.R. § 2590.712(a) ...........................................................................16

29 C.F.R. § 2590.712(c)(4)(ii) ..................................................................16

29 C.F.R. § 2590.712(c)(4)(iii) .................................................................18

42 C.F.R. Part 483, Subpart B ..................................................................17

Fed. R. Civ. P. 12(b)(1)............................................................................11

Fed. R. Civ. P. 12(b)(6)............................................................................11

Fed. R. Civ. P. 12(c) ................................................................................11

Fed. R. Civ. P. 26(f) ............................................................................7, 15

Fed. R. Civ. P. 201 ....................................................................................9

NOTICE OF MOTION AND MOTION TO DISMISS OR FOR JUDGMENT,
OR PARTIAL JUDGMENT, ON THE PLEADINGS; MPA IN SUPPORT

**NOTICE OF MOTION AND MOTION**

Please take notice that, on August 24, 2023, at 10:00 a.m. in Courtroom 8, 19th Floor, in the above-entitled court, or at such other time and place as may be ordered by the Court, Defendant University of San Francisco Welfare Benefit Plan (the "Plan") will move and hereby does move for an order granting the Plan's Motion to Dismiss or for Judgment, or Partial Judgment, on the Pleadings. Additionally, at the Court's request, the Plan will and hereby does move for a ruling that the "abuse of discretion" standard of review applies to the Claims Administrator's determination that mental health services rendered at Innercept following its March 20, 2021 accreditation were not medically necessary.

This motion is made pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(c) and is based on this Notice of Motion and Motion, the below Memorandum of Points and Authorities, the accompanying Request for Judicial Notice, all pleadings and records on file with the court, and on such oral argument as may be presented at the hearing on this Motion. Additionally, to address the standard of review issue, the Plan submits the accompanying Declaration of Diane L. Nelson.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiff J.G.'s ("J.G.") adult son received mental health treatment at two Residential Treatment Centers ("RTC") in Utah. The University of San Francisco Welfare Benefit Plan (the "Plan") denied payment of the son's claims on grounds that the RTCs were not accredited, as required under the Plan's terms of coverage. J.G—but not his adult son—has now filed this lawsuit, alleging that the Plan's accreditation requirement for RTCs violates the Mental Health Parity and Addiction Equity Act, enacted as part of ERISA, 29 U.S.C. § 1185a ("Parity Act") and seeking to recover benefits under the Plan. The operative First Amended Complaint's ("FAC") allegations, however, are insufficient to establish that J.G. has statutory standing under ERISA or Article III standing under the U.S. Constitution. Because he lacks standing, J.G. cannot maintain the claims alleged, which should be dismissed.

Further, the FAC's allegations do not state a claim for relief under the Parity Act. The FAC alleges that the type of mental health services rendered at an RTC are analogous to those rendered

1  for physical conditions at skilled nursing facilities ("SNF"), yet the Plan does not require

2  accreditation for an SNF.  However, what the FAC fails to acknowledge is that Plan terms,

3  incorporated into the FAC by reference and/or properly subject to judicial notice, contain

4  comparable requirements for an SNF.  Specifically, whereas an RTC must be accredited, an SNF

5  must be Medicare eligible for medically necessary services rendered at either to be covered.  As

6  courts have made clear, there is *no meaningful difference* between an accreditation requirement for

7  an RTC and a Medicare eligibility requirement for an SNF.  Consequently, J.G.'s Parity Act claim—

8  to the extent he even has standing to assert it, fails to state a claim for relief.

9      In the parties' Rule 26(f) conference, in spite of the FAC's repeated references to Parity Act

10  violations, J.G. disclaimed that a Parity Act claim is alleged.[1]  If so, the FAC's allegations still

11  foreclose J.G.'s claims associated with services rendered at unaccredited RTCs.  That is because the

12  FAC expressly acknowledges that the Plan *does not cover* such services.  Neither J.G., nor even his

13  son if he is ever substituted as a plaintiff, can seek to recover benefits that the Plan *does not cover*.

14      Finally, at the Court's request, the Plan addresses the proper standard of review to be applied

15  to the Claims Administrator's denial of benefits at Innercept following its March 20, 2021

16  accreditation.  The Administrative Services Agreement between the Plan and its Claims

17  Administrator, Anthem Blue Cross Life and Insurance Company ("Anthem"), provides that Anthem

18  is "delegated full discretion to determine eligibility for benefits under the Plan and to interpret the

19  terms of the Plan."  Accordingly, an abuse of discretion standard applies to Anthem's determination

20  that the services the son received at Innercept following its accreditation were not medically

21  necessary.

22  **II.    BACKGROUND**

23      The University of San Francisco Welfare Benefit Plan is an ERISA-regulated employee

24  welfare benefit plan.  (See FAC.)  The FAC seeks to recover ERISA Plan benefits for mental health

25  services rendered to Plaintiff J.G.'s adult son, K.G.  Of note, J.G. is the only named plaintiff.  The

26  FAC alleges that J.G. is a Plan participant and his son a dependent.  (FAC ¶ 4.)

27

28

---

[1] /      J.G. also indicated that the son could be substituted as plaintiff to address the standing issue.
To date, leave to amend has not been sought.

**A.     K.G.'s July 20, 2020-October 20, 2020 Treatment at Unaccredited Bridge House**

The FAC alleges that K.G. has a history of mental illness and emotional disturbances.  (FAC ¶¶ 7-9.)  Following a suicide attempt, K.G., 18 years old at the time, was hospitalized and then, on July 14, 2020, admitted to residential treatment at Bridge House, which is licensed by the State of Utah to provide mental health residential treatment.  (FAC ¶¶ 15-17.)  K.G. was ultimately discharged from Bridge House on October 20, 2020.  (FAC ¶ 21.)

The FAC alleges that the Plan initially approved benefits for K.G.'s residential treatment at Bridge House between his July 14, 2020 admission and July 27, 2020.  (FAC ¶ 23.)  However, coverage was subsequently denied for the July 28, 2020 to October 20, 2020 dates of service because Bridge House is not an accredited residential treatment center, as required by Plan terms.  (FAC ¶ 24.)

**B.     K.G.'s October 20, 2020-July 15, 2022 Treatment at Innercept, Which Became Accredited Effective March 20, 2021**

Following his stay at Bridge House, K.G. was then treated at Innercept from October 20, 2020 to July 15, 2022.  (FAC ¶¶ 30-34.)  Innercept too was not accredited, but became accredited "effective March 20, 2021."  (FAC ¶ 36.)  The Plan denied coverage for the October 20, 2020 to March 19, 2021 dates of service due to Innercept's lack of accreditation.  (FAC ¶¶ 35-36.)  As to post-accreditation dates of service, the Plan denied coverage on grounds the services were not medically necessary.  (FAC ¶ 37.)

The FAC alleges that J.G. "*incurred* the cost of John's [sic] treatment at Bridge House and Innercept."  (FAC ¶ 42, emphasis added.)  It is unclear from the FAC's allegations if J.G. actually paid any amounts billed by Bridge House or Innercept.  Of note, Paragraph 46 of the FAC vaguely refers to "bills incurred" rather than "bills paid."

**C.     J.G.'s Claims**

The FAC asserts claims against the Plan for: (1) "denial of plan benefits under ERISA"; and (2) "equitable relief" pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B), *i.e.*, for "restitution of all past benefits due."  The FAC acknowledges that the Plan does not cover treatment at unaccredited residential treatment centers ("RTC"), that Bridge House was at all relevant times unaccredited, and that Innercept only became accredited effective March 20, 2021.  (FAC ¶¶ 24-25, 27, 29, 35-36.)

The principal thrust of J.G.'s claims, as the Plan reads the FAC, is his allegation that the Plan's accreditation requirement for RTCs is discriminatory and a violation of both state and federal mental health parity laws.[2]  (FAC ¶¶ 25, 36.)  Specifically, the FAC alleges that the type of mental health services rendered at an RTC are analogous to those rendered for physical conditions at skilled nursing facilities ("SNF"), yet the Plan does not require accreditation for an SNF.  (*Id.*)  In addition to this Parity Act claim, J.G. alleges that the Plan improperly denied claims for his adult son's post-accreditation treatment at Innercept on grounds such treatment was not medically necessary.  (FAC ¶ 38.)

### D.    Relevant Plan Terms

Because the Plan's terms are referenced in the FAC and form the basis for the claims alleged, Plan terms, as set forth in the Plan's 2020 PPO Plan Benefit Booklet ("Benefit Booklet"), are properly incorporated by reference into the FAC and/or a proper subject of judicial notice.  (FRCP 201; *Immanuel Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *3 (N.D. Cal. 2020) ("A defendant may seek to incorporate a document into the complaint "if the plaintiff refers *extensively* to the document or the document forms the basis of the plaintiff's claim."; "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."); *Delgado v. ILWU-PMA Welfare Plan*, 2019 WL 2864427, at *1 (C.D. Cal. 2019) (ERISA plan's welfare agreement properly incorporated by reference where complaint referenced it and claims were premised upon it); *Rodrigues v. Bank of Am., NA*, 2016 WL 3566950, at *1 n.1 (N.D. Cal. 2016) (taking judicial notice of plan document and summary plan description under the "incorporation by reference" doctrine).)  As relevant here, the Benefit Booklet provides:

> This *plan* provides coverage for the *medically necessary* treatment of *mental health conditions* and substance abuse.  This coverage is provided according to the terms and conditions of this *plan* that apply

---

[2] /    The federal Mental Health Parity and Addiction Equity Act ("Parity Act"), 29 U.S.C. § 1185a, was enacted as part of ERISA and thus "is enforceable through a cause of action under § 1132(a)(3) as a violation of a 'provision of this subchapter.'"  (*Raygoza v ConAgra Foods, Inc. Welfare Benefit Wrap Plan*, 2016 WL 9454419, fn. 5 (C.D. Cal. 2016).)  While the FAC is not the model of clarity, it appears J.G. is alleging that Plan terms violate the Parity Act.

1

> to all other medical conditions, except as specifically stated in this section.

2

3

> Services for the treatment of *mental health conditions* and substance abuse covered under this plan are subject to the same deductibles, co-payments and co-insurance that apply to services provided for other covered medical conditions and *prescription drugs*.

4

5

(Nelson Dec., Ex. A at at p. 70, emphasis in original.)  The Benefit Booklet contains the following

6

definitions:

7

> **Residential treatment center** is an inpatient treatment facility where the patient resides in a modified community environment and follows a comprehensive medical treatment regimen for treatment and rehabilitation of a *mental health condition* or substance abuse.  The **facility must be licensed** to provide psychiatric treatment of *mental health condition* or substance abuse **according to state and local laws** and requires a minimum of one *physician* visit per week in the facility. The facility **must be fully accredited** by The Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA).

8

9

10

11

12

13

> **Skilled nursing facility** is an institution that provides continuous skilled nursing services. **It must be licensed according to state and local laws** and **be recognized as a skilled nursing facility under Medicare**.

14

15

16

(*Id*. at pp. 155, 163-164, bold added, other emphasis in original.)  Of note, the Plan caps coverage for

17

treatment at a SNF to 100 days per calendar year.  (*Id*. at p. 14.)  There is no corresponding

18

limitation on treatment in a RTC.

19

> The Benefit Booklet also contains an anti-assignment clause:

20

> The coverage, rights, and benefits under the *plan* are **not assignable by any *member* without the written consent of the *plan***, except as provided above. This prohibition against assignment includes rights to receive payment, claim benefits under the *plan* and/or law, sue or otherwise begin legal action, or request *plan* documents or any other information that a participant or beneficiary may request under ERISA. **Any assignment made without written consent from the *plan* will be void and unenforceable.**

21

22

23

24

25

(*Id*. at p. 140, emphasis in bold added.)

26

///

27

///

28

///

NOTICE OF MOTION AND MOTION TO DISMISS OR FOR JUDGMENT,
OR PARTIAL JUDGMENT, ON THE PLEADINGS; MPA IN SUPPORT

III.   **ARGUMENT**

    A.   **The Legal Standard**

        1.   **Rule 12(b)(1)**

"Lack of standing is 'properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1).'" (*Free Spirit Organics, NAC v. San Joaquin Cnty. Bd. of Supervisors,* 471 F.Supp.3d 1039, 1045 (E.D. Cal. 2020).) "Rule 12(b)(1) jurisdictional attacks can be either facial or factual." (*Id.*) "'In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.'" (*Id.*) The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the elements to satisfy Article III standing. (*Id.*) "[T]he plaintiff must 'clearly . . . allege facts demonstrating' each element." (*Id.*)

        2.   **Rule 12(c)**

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." (Fed. R. Civ. P. 12(c).) A motion for judgment on the pleadings "challenges the legal sufficiency of the opposing party's pleadings." (*William Schwarzer et al, Federal Civil Procedure Before Trial* ¶ 9:316 (2014).) The legal standards governing Rules 12(c) and 12(b)(6) are "functionally identical," *Cafasso, U.S. ex rel. v. General Dynamics C4 Sys., Inc.,* 637 F.3d 1047, 1054 n. 4 (9th Cir. 2011), as both permit challenges directed at the legal sufficiency of the parties' allegations. Thus, a judgment on the pleadings is appropriate when the pleaded facts, accepted as true and viewed in the light most favorable to the non-moving party, entitle the moving party to a judgment as a matter of law. (*Hoeft v. Tucson Unified Sch. Dist.,* 967 F.2d 1298, 1301 (9th Cir. 1992); *see also Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). It is the practice of many judges to permit "partial" judgment on the pleadings as to particular claims. (*Strigliabotti v. Franklin Resources, Inc.*, 398 F.Supp.2d 1094, 1097 (N.D. Cal. 2005); *Curry v. Baca*, 497 F.Supp.2d 1128, 1130 (C.D. Cal. 2007).)

In resolving a Rule 12(c) motion, the court can consider (without converting the motion to a summary judgment) (a) the complaint and answer; (b) any documents attached to or mentioned in the pleadings; (c) documents not attached but "integral" to the claims; and (d) matters subject to

1   judicial notice.  (*L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2nd Cir. 2011); *Massey v.*

2   *Ojaniit*, 759 F.3d 343, 347-348 (4th Cir. 2014).)

**B.    Because J.G. Lacks Standing to Pursue the Claims Alleged, the FAC Should Be Dismissed**

4       To bring his ERISA claims, J.G. must have both statutory standing under ERISA and

5   constitutional (Article III) standing.  (*Potter v. Blue Shield of Calif.*, 2014 WL 6910498, *4 (C.D.

6   Cal. 2014).)  Here, the FAC's allegations are insufficient to establish either, and this defect cannot be

7   cured.  As a result, the FAC should be dismissed.

**1.    J.G. Does Not Have Statutory Standing Under ERISA**

9       Section 1132 of ERISA confers standing to bring suit on participants, beneficiaries,

10  fiduciaries, or the Secretary of Labor.  (29 U.S.C. § 1132 (2014).)  Section 1132(a)(1)(B) states that

11  a civil action may be brought by a participant or beneficiary "to recover benefits *due to him* under

12  the terms of his plan, to enforce *his rights* under the terms of the plan, or to clarify *his rights* to

13  future benefits under the terms of the plan."  (29 U.S.C. § 1132(a)(1)(B) (emphasis added).)  Here,

14  although J.G. is a Plan participant, his lawsuit does not seek to enforce *his rights* under the Plan but,

15  rather, his adult son's rights.  As a result, the FAC fails to allege facts sufficient to support J.G.'s

16  standing to sue under ERISA.

17      Numerous district courts have held that, under ERISA's plain language, parents lack standing

18  to bring ERISA claims on behalf of their adult children or other adult dependents.  (See *Sides v.*

19  *Cisco Sys. Inc.,* 2017 WL 4236960, *6 (N.D. Cal. 2017) (complaint failed to allege facts sufficient to

20  support statutory standing under ERISA because father had not alleged that he paid the bills for his

21  son's medical care, or that equitable subrogation was appropriate); *Lightfoot v. Principal Life Ins.*

22  *Co.*, 2011 WL 2036649 (W.D. Okla. 2011) (plan participant father lacked derivative standing under

23  ERISA to pursue claim for plan benefits on behalf of adult son; to hold otherwise would require the

24  court to "ignore the phrase 'under the terms of his plan' that immediately follows 'benefits to due to

25  him' in § 1132(a)(1)(B)); *Ray v. PPOM*, 2005 WL 1984470, *2 (E.D. Mich. 2005) ("A parent of a

26  plan beneficiary, even a parent whose employment is the source of the injured party's claim to

27  benefits does not have standing in her individual capacity to sue to enforce payment of medical

28  benefits to another party solely on the grounds that [she] would be liable for payment of the medical

bills if the plan does not pay them."; "there is no evidence that the [son], an adult, would be unable

to bring a claim on his own behalf"); *Burton v. Blue Cross Blue Shield of Kansas City*, 2013 WL

6709570 (D. Kan. 2013) (Under the language of the statute, husband lacked standing to sue for

benefits due to wife because he did not allege "that the benefits [were] *due to him* under the terms of

*his plan* or that he is seeking to *enforce his rights* or to clarify *his rights* to future benefits) (emphasis

in original); *Powers v. Blue Cross Blue Shield of Ill.*, 947 F.Supp.2d 1139 (D. Col. 2013) ("[W]ith

respect to ERISA standing, there is no allegation that the benefits were due to the plaintiff []  Under

the language of the statute, the plaintiff does not have standing . . . .").)

The Plan anticipates that J.G. will call attention to the holding in *Potter v. Blue Shield of

Calif.*, 2014 WL 6910498 (C.D. Cal. 2014), a case handled by J.G.'s same counsel.  In *Potter*, as

here, a father filed suit to recover ERISA plan benefits for his adult son's mental health treatment.

The court held that the father's complaint plead sufficient facts to support derivative standing under

ERISA under a theory of equitable subrogation because: (1) the father *paid* the medical bills; (2) the

plan *communicated primarily with the father* on the claims; and (3) the son's severe disability

created a moral obligation on the father's part to act because the *son was unable to himself sue*.  (*Id*.

at 4-8.)

*Potter* is readily distinguished.  First, here, there is no allegation that J.G. actually paid any of

Bridge House's or Innercept's bills.  Second, there is no allegation that J.G. principally

communicated with the Plan as to K.G.'s claims.  Third, there is no allegation that K.G. is unable to

himself pursue claims for relief under ERISA.  Further, as noted, the Plan contains an anti-

assignment clause, which is enforceable.  (*Spinedex v. Physical Therapy USA Inc. v. United

Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1296 (9th Cir. 2014) ("Anti-assignment clauses in

ERISA plans are valid and enforceable.").)  To allow J.G. to step into his son's shoes to sue the Plan

would be directly contrary to the anti-assignment clause, making subrogation inequitable to the

Plan.[3]

---

[3] /     As the Court noted in *Potter*, the complaint there alleged facts to support all five elements of
equitable subrogation, *i.e.*, (1) payment must have been made by the subrogee to protect his own
interest; (2) the subrogee must not have acted as a volunteer; (3) the debt paid must be one for which
the subrogee was not primarily liable; (4) the entire debt must have been paid; and (5) subrogation
must not work any injustice to the rights of others.  (*Potter*, *supra*, 2014 WL 6910498, *8.)  By

1    In sum, the plain language of ERISA precludes J.G.'s claims.  Because J.G. does not seek to

2  recover any benefits *due him* under the Plan, or to enforce *his rights* under the Plan, or to clarify *his*

3  *rights* under the Plan, he lacks statutory standing.  Given the anti-assignment clause, this pleading

4  defect cannot be cured, and the FAC should be dismissed, and judgment entered against J.G.

5              **2.      J.G. Also Lacks Article III Standing**

6    J.G. also lacks standing under Article III of the U,S. Constitution.  There are three elements

7  to establish Article III standing.  "First, the plaintiff must have suffered an 'injury in fact'- an

8  invasion of a legally protected interest which is (a) concrete and particularized, (b) actual or

9  imminent, not 'conjectural' or 'hypothetical.'  Second, there must be a causal connection between

10  the injury and the conduct complained of-the injury has to be fairly tracable to the challenged action

11  of the defendant, and not the result of the independent action of some third party not before the

12  court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by

13  a favorable decision." (*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) (internal citations

14  omitted).)

15    Here, J.G. has not suffered any injury in fact because the benefits he seeks would have been

16  due, if at all, to his son, and not to him.  (*Burton*, *supra*, 2013 WL 6709570 (D. Kan. 2013) ("The

17  plaintiff's constitutional standing is not established because there is no allegation in the Complaint

18  that the plaintiff himself was necessarily injured by the defendant's refusal to authorize treatment

19  [for his wife].").)  Moreover, J.G. has not alleged that he paid for his son's treatment, was ever

20  obligated to do so, or that he is an assignee (which, given the anti-assignment clause, cannot be

21  alleged).  (*Potter*, *supra*, 2014 WL 6910498, *9 (father possessed Article III standing because he

22  "paid out money" and was an assignee).)

23    In sum, J.G. lacks both statutory standing and Article III standing.  Consequently, the FAC

24  should be dismissed.

25  ///

26  ///

27  ────────────────────

   contrast, here, the FAC does not allege facts to support any element of equitable subrogation, nor

28  could it given the Plan's enforceable anti-assignment clause.

**C.     To the Extent Recovery Is Sought for Services Rendered at Unaccredited RTCs, the FAC Fails to State a Claim for Relief.**

While the FAC is not the model of clarity, J.G. appears to be asserting a statutory violation of ERISA/the Parity Act based on the Plan's accreditation requirement for RTCs.  (*Raygoza, supra,* 2016 WL 9454419 (explaining the difference between a claim for ERISA plan benefits versus a claim for a statutory violation based on a violation of the Parity Act).)  Specifically, according to J.G., the type of mental health services rendered at RTCs are analogous to those rendered for physical conditions at SNFs, yet the Plan does not require accreditation for an SNF.  (FAC ¶¶ 25, 36.)  According to the FAC, the Plan's accreditation requirement for RTCs is thus a violation of the Parity Act.  (*Id*.)  However, the FAC omits reference to the fact that the Plan, although not requiring accreditation for an SNF, requires SNFs to be Medicare eligible.  Because there is no material distinction between an accreditation requirement for an RTC, and a Medicare eligibility requirement for an SNF, the FAC fails to state a claim for relief for violation of the Parity Act.

The Plan acknowledges that J.G., during the parties' Rule 26(f) conference, disclaimed any Parity Act claim.  Regardless, the FAC still fails to state a claim for relief for benefits rendered at unaccredited RTCs.  That is because the FAC expressly acknowledges that the Plan *does not cover* such services.  Thus, either way—whether a Parity Act claim is alleged or not—no viable claim can be maintained for all dates of service at Bridge House and dates of service at Innercept before its March 20, 2021 accreditation.

**1.     The Parity Act Claim Fails to State a Claim for Relief Because, as a Matter of Law, an RTC Accreditation Requirement Is Not Materially Different Than an SNF Medicare Eligibility Requirement**

**a.     The Parity Act**

"Congress enacted the [Parity Act] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans."  *(Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2nd Cir. 2016) (citation omitted).)  "[T]he Parity Act requires ERISA plans to treat sicknesses of the mind in the same way that they would a broken bone."  (*Munnelly v. Fordham Univ. Faculty*, 316 F.Supp.3d 714, 728 (S.D.N.Y. 2018) (quotation

and citation omitted).)  "Although there is no private right of action under the Parity Act, portions of the law are incorporated into ERISA and may be enforced using the civil enforcement provisions in ERISA." (*Id.*)

The Parity Act requires that "treatment limitations applicable to . . . mental health or substance use disorder benefits" be "no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan." (29 U.S.C. § 1185a(a)(3)(A)(ii).)  An ERISA plan also cannot have "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits." (*Id.*)  The Parity Act's definition of a "treatment limitation" includes "limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment." (*Id.* at § 1185a(a)(3)(B)(iii).)  The enacting regulations make clear that this includes "nonquantitative treatment limitations" such as "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness, or based on whether the treatment is experimental or investigative" and "[r]estrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for services provided under the plan or coverage." (29 C.F.R. § 2590.712(a) & (c)(4)(ii).)

For purposes of comparing treatment limitations, the implementing regulations establish various "classifications" of levels of care and, within each classification, require consistent treatment of mental health or substance abuse care, on the one hand, and of medical or surgical care, on the other hand. (*See id.* § 2590.712(c)(2)(ii)(A).)  Corresponding administrative guidance specifically equates residential treatment with skilled nursing facilities and rehabilitation hospitals. (*See* Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008; Technical Amendment to External Review for Multi-State Plan Program, 78 Fed. Reg. 68240, 68247 (Nov. 13, 2013) ("For example, if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in residential treatment facilities for mental health or substance user disorders as an inpatient benefit.").)

///

1        To state a Parity Act claim, a plaintiff must "(1) identify a specific treatment limitation on

2   mental health benefits; (2) identify medical/surgical care covered by the plan that is analogous to the

3   mental health/substance abuse care for which the plaintiffs seek benefits; and (3) plausibly allege a

4   disparity between the treatment limitation on mental health/substance abuse benefits as compared to

5   the limitations that defendants would apply to the covered medical/surgical analog." (*Johnathan Z.*

6   *v. Oxford Health Plans*, 2020 WL 607896, at *13 (D. Utah 2020).)

7                    **b.      The FAC Does Not Plausibly Allege a Disparity Between the**
                             **Plan's Definition of an RTC and the Plan's Definition of an SNF**
8

9        The FAC fails to allege a plausible disparity between the Plan's requirements for SNFs and

10  RTCs.  (*Bell Atlantic v. Twombly,* 550 U.S. 544, 570 (2007) (a plaintiff must "nudge[ ][his] claims

11  across the line from conceivable to plausible.)  The Plan requires that both SNFs and RTCs be

12  licensed.  (RJN, Ex. A at pp. 155, 163-164.)  And, while an RTC must also be accredited, a SNF

13  must also be "recognized as a skilled nursing facility under Medicare."[4]  (*Id.*)  This is not a material

14  distinction as a matter of law.  (*J.W. v. Bluecross Blueshield of Texas*, 2002 WL 2905657 (D. Utah

15  2022).)

16      In *J.W.*, the plaintiff alleged claims for: (1) denial of ERISA plan benefits; and (2) a claim for

17  violation of the Parity Act.  The claims related to M.W.'s treatment first at Evoke and then at Live

18  Strong House.  The plan denied the claims because neither facility met the plan's definition of a

19  residential treatment center.  In granting the motion to dismiss on the Parity Act claim, the court

20  explained:

21                  Plaintiffs [] allege that the plan requires more onerous licensing
                    requirements for residential treatment centers than for skilled nursing
22                  facilities.  This assertion is not supported by the terms of the plan.  The
                    plan requires that a skilled nursing facility be licensed by the State
23

---

24  [4] /     An SNF must be in compliance with the requirements in 42 C.F.R. Part 483, Subpart B, to
    receive payment under the Medicare or Medicaid programs.  To certify a SNF, a state surveyor
25  completes at least a Life Safety Code (LSC) survey, and a Standard Survey.  (*Id.*) The State is
    responsible for certifying an SNF's compliance or noncompliance.  (*Id.*)  However, the State's
26  certification is then subject to Centers for Medicare and Medicaid Services' approval.  (*Id.*; see also
    https://www.medicare.gov./coverage/skilled-nursing-facility-snf-care.  This is not materially
27  different that, for example, the Joint Commission accreditation process, explained at:
    https://www.jointcommission.org/resources/news-and-multimedia/fact-sheets/facts-about-
28  accreditation-process-overview/.

where it is located if state law provides for licensing of such facilities. *See* Dkt. No. 15-2 at 86. But if state law does not provide for licensing, then the facility must be Medicare or Medicaid eligible. *See id.* Similarly, the plan requires that a residential treatment center providing mental health care or substance abuse treatment "be licensed in the state where it is located *or* accredited by a national organization." *Id.* at 85 (emphasis added). In each case, the facility must thus be licensed by the State or approved by a national organization or program.  **Plaintiffs do not allege that eligibility for Medicare is meaningfully more lenient than accreditation by a national organization.**

Because the Parity Act requires only that nonquantitative treatment limitations for mental health benefits be "*comparable to*" and "applied no more stringently than for medical/surgical benefits," 29 C.F.R. § 2590.712(c)(4)(iii) (Example 4) (emphasis added), Plaintiffs have failed plausibly to allege that the minor difference between the Plan's licensing requirements for residential treatment centers and its analogous requirements for skilled nursing facilities violates the statute.

(*Id.* at *6 (emphasis added).)  The court reached a similar conclusion in *James C. v. Anthem Blue Cross and Blue Shield*, 2021 WL 2532905 (D. Utah 2021), albeit on a motion for summary judgment.[5]  As the court there held,

Plaintiffs next highlight that the Plan requires a Residential Treatment Center to be 'fully accredited by the Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA)" (R202, ECF No. 72-2), but that a Skilled Nursing Facility need only be "licensed by the state in which it operates to provide medically skilled services to inpatients." (*Id.*). **Again, the court does not find that this is a meaningful difference that constitutes a disparate limitation on treatment**, especially when Maple Lake's accreditation, or lack thereof, was immaterial to Anthem's decision to deny coverage.[6]

(*Id.* at *19 (emphasis added); see also *H.H. v. Atena Ins. Co*., 342 F.Supp.3d 1311, 1320 (S.D. Fla. 2018) (dismissing Parity Act claim where plaintiffs alleged that Aetna used more stringent criteria to

///

///

_____

[5] /    Because a claim for ERISA plan benefits was also alleged, which required the court to assess the claims administrative record and which could not be adjudged on the pleadings, the legal insufficiency of the Parity Act claim was raised later in the case.

[6] /    Here, by contrast, the lack of accreditation was material to the denial of coverage.  Even so, the court's view that an accreditation requirement for a RTC is not meaningfully different than a licensure requirement for a SNF remains valid.

evaluate residential mental health treatment centers than it used to evaluate skilled nursing facilities, but failed to state "what criteria Aetna requires of skilled nursing facilities").)

In sum, because there is no meaningful difference between an accreditation requirement for an RTC and a Medicare eligibility requirement for an SNF, nor any allegation of such, the FAC fails to state a claim for relief under the Parity Act and the Court should grant partial judgment on the pleadings against J.G. as to this claim.[7]

### 2.    Even if a Parity Act Claim Is Not Alleged, Benefits Cannot Be Paid for Services that the Plan Does Not Cover

Even if J.G is not alleging a Parity Act claim, and instead seeks to recover Plan benefits for services rendered at unaccredited RTCs, this claim too fails.  That is because the FAC expressly acknowledges that such services are *not covered* by the Plan.  (FAC ¶ 24 ("the Plan requires [RTCs] have accreditation; the Plan's accreditation requirement for residential treatment . . . ).)  As the court explained in *Raygoza,*

> Plaintiff fails to identify a plan term that entitles her to coverage of her claimed benefit.  Perplexing as Plaintiff's position may be, the Court is bound to grant Defendant's Motion on this basis: Because Plaintiff does not contend that the existing terms of the Plan entitle her to the benefit that she seeks, Plaintiff cannot state a claim under section 1132(a)(1)(B), which "speaks of 'enforc[ing]' the 'terms of the plan,' not of changing them." . . . Recovery of benefits under section 1132(a)(1)(B) is limited to those benefits that the plaintiff contends are actually covered under the Plan's existing terms.

(*Id*. at **3-4 (citations omitted).)

### D.    Amendment Would Be Futile

Leave to amend may be denied when amendment would be futile.  (*Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990) ("A trial court may deny [leave to amend] if permitting an amendment would . . . result in futility for lack of merit.").)  Here, no amendment can confer statutory and Article III standing on J.G.  Further, no amendment can cure the defect in the pleadings as to the Parity Act claim or, alternatively, any efforts to recover benefits due that the Plan does not cover.  Accordingly, the Plan submits that its motion should be granted, and leave to amend denied.

---

[7] /    The Plan highlights that it limits care in an SNF to 100 days per calendar year and no similar limitation is placed on RTCs.

**E.    Anthem's Denial of K.G.'s Claim for Post-Accreditation Dates of Service at Innercept Is Reviewed for Abuse of Discretion**

During the initial Case Management Conference, the Court asked the parties to also brief the appropriate standard of review to be applied to Anthem's denial of the son's claim for post-accreditation (*i.e.*, after March 20, 2021) services at Innercept.  That aspect of the claim was denied by Anthem due to lack of medical necessity.  Because the Administrative Services Agreement between the Plan, which is self-funded by the University of San Francisco, and Anthem provides that Anthem is "delegated *full* discretion to determine eligibility for benefits under the Plan *and* to interpret the terms of the Plan," the denial of this claim is reviewed for abuse of discretion.  (Nelson Dec. ¶¶ 3, 5, Ex. B; *Burke v. Pitney Bowes, Inc. Long Term Disability Plan*, 544 F.3d 1016, 1023-1024 (9th Cir. 2008) (where an ERISA Plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the district court applies the deferential abuse of discretion standard); *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (same).)

**IV.    CONCLUSION**

For the foregoing reasons, the Plan respectfully requests that its motion to dismiss or for judgment on the pleadings be granted.  The FAC should be dismissed with prejudice because it fails to allege facts to support statutory and Article III standing, and these defects cannot be cured.

Further, J.G.'s Parity Act claim is not legally cognizable when the Plan's full terms are considered.  As a matter of law, an accreditation requirement for an RTC is comparable to a Medicare eligibility requirement for an SNF and J.G. cannot plausibly allege to the contrary.  Alternatively, if no Parity Act claim is alleged, there remains no viable claim for benefits for services rendered at unaccredited RTCs because the Plan provides no such coverage.

Finally, because the Plan grants Anthem full discretion to determine eligibility for benefits and to interpret Plan terms, an abuse of discretion standard applies to Anthem's denial of J.G.'s claim for post-accreditation dates of service at Innercept, which were denied due to lack of medical necessity.

///

1   Dated:  June 16, 2023                **DUANE MORRIS LLP**

2                                        By:_/s/ Eden E. Anderson_

3                                           James S. Brown
                                            Eden E. Anderson
4
                                            Attorneys for Defendant
5                                           UNIVERSITY OF SAN FRANCISCO WELFARE
                                            BENEFIT PLAN
6
    DM2\17477886.2
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28